PEOPLE v PFAFFLE

Docket No. 218480. Submitted May 23, 2001, at Marquette. Decided June
5, 2001, at 9:10 A.M. Leave to appeal denied, 465 Mich ___.

Mark C. Pfaffle was convicted following a bench trial in the Marquette
Circuit Court, John R. Weber, J., of two counts of recruiting, induc-
ing, soliciting, or coercing a minor to commit a felony, MCL
750.157c, and of fourth-degree criminal sexual conduct (CSC IV) The
convictions under MCL 750.157c arose out of the defendant's
alleged attempts to convince a fifteen-year-old boy to help him to
rape and to kill children. The defendant had assembled in a tent in
the woods the implements necessary to carry out his plan to rape
and to kill children that the boy would lure into the woods. The
boy testified that he did not lure any children into the woods and
did not intend to lure children into the woods, but that he did not
tell the defendant that he did not intend to go along with the defen-
dant's plan, because he wanted the defendant to continue to give
him alcohol and cigarettes. The CSC IV conviction arose out of an
incident in which the defendant touched the boy's genitals. There
was also testimony that the defendant allegedly tried to abduct a
four-year-old boy through the offer of toys, but was prevented from
accomplishing the act by the appearance of the boy's mother. At
the sentencing hearing, in arguing for life sentences for the convic-
tions under MCL 750.157c, the prosecutor indicated that his son
had been a friend of the four-year-old boy the defendant had tried
to abduct. The court imposed concurrent sentences of life impris-
onment for the two convictions under MCL 750.157c and of one
year in prison for the CSC IV conviction. The defendant moved for a
new trial on the basis that the prosecutor was prejudiced against
the defendant because of the prosecutor's personal connection
with the case. The court denied the motion, finding that the pros-
ecutor's zeal in the conducting of the prosecution was not the
result of a personal conflict of interest, but was rather the result of
a belief in the need to protect the community as a whole. The
defendant appealed.

The Court of Appeals held:

1. The trial court did not err in denying the defendant's motion
for a new trial. The record does not support the defendant's con-

tention that the prosecutor's connection with the potential victim created a conflict of interest that prejudiced the defendant. Although the potential victim was a friend of the prosecutor's son, the record clearly shows that the prosecutor did not know the victim personally and had no personal stake in the outcome of the case other than to protect the community, which was his job. There is nothing to suggest that the prosecutor's insistence that any plea agreement be conditioned on a long sentence or his argument for life sentences without parole were motivated by other than a belief that the community was at risk from the defendant.

2. The defendant's arguments that MCL 750.157c must be construed to make it a felony to recruit, induce, solicit, or coerce a minor to commit or to attempt to commit a felony only where such recruitment, inducement, solicitation, or coercion results in the minor's actually committing or attempting to commit the proposed felony and that without requiring proof that the minor actually committed or attempted to commit the proposed felony, the crime prohibited by MCL 750.157c will simply duplicate the crime prohibited by MCL 750.157b are of no avail. MCL 750.157c makes it a felony for a person seventeen years of age or older to recruit, induce, solicit, or coerce a minor less than seventeen years of age to commit or attempt to commit an act that would be a felony if committed by an adult. The Legislature's use of the disjunctive clearly indicates the four stated acts by the adult should be considered separately. Although the words "induces" and "coerces" convey the meaning that the person that is induced or coerced acts in response to the inducement or coercion, the words "recruits" and "solicits" convey no such meaning that the person that is recruited or solicited acts in response to the recruitment or solicitation. The unambiguous language of MCL 750.157c indicates a clear intent by the Legislature that an adult can be found guilty under that statute if the adult recruits or solicits a minor to commit or to attempt to commit a felony, even if the minor does not actually commit or attempt to commit the felony.

3. The defendant's reliance on the holding in *People v Rehkopf*, 422 Mich 198 (1985), is misplaced. At the time of the *Rehkopf* decision, MCL 750.157b made it a felony for one to incite, induce or exhort another person to commit one of the enumerated crimes. The *Rehkopf* Court held that the statute was ambiguous and applied the rule of lenity to interpret the language of the statute to require that conviction could be had only if the person who was incited, induced, or exhorted actually committed or attempted to commit the enumerated crime. The decision in *Rehkopf* is not persuasive in determining the scope and intent of MCL 750.157c

because the language of MCL 750.157b has been substantially amended since the *Rehkopf* decision, the language of MCL 750.157c differs substantially from the language of MCL 750.157b as it was at the time of the *Rehkopf* decision, and MCL 750.157c is directed to the special situation in which an adult tries to take advantage of a minor through the recruitment, solicitation, inducement, or coercion of the minor to commit or to attempt to commit a felony.

4. The separate convictions of the defendant for the recruiting, inducing, soliciting, or coercing of the minor to commit or to attempt to commit the felonies of rape and of murder did not constitute double jeopardy. The Legislature clearly intended to punish an adult for the recruitment, inducement, solicitation, or coercion of a minor to commit or to attempt to commit each separate proposed felony for which the minor was recruited, solicited, or coerced, even if the adult had in mind only a single plan encompassing more than one felony.

5. The trial court did not abuse its discretion in imposing the two life sentences. The sentences imposed were proportionate to the seriousness of the crimes and to the threat that the defendant posed to the community.

Affirmed.

1. Criminal Law — Inducement to Commit Felony — Minors — Elements of Crime.

   The statute that makes it a felony for a person seventeen years of age or older to recruit, induce, solicit, or coerce a minor less than seventeen years of age to commit or to attempt to commit an act that would be a felony if committed by an adult does not, to the extent that recruitment or solicitation of the minor is charged, require proof that the minor actually committed or attempted to commit the proposed felony (MCL 750.157c).

2. Criminal Law — Inducement to Commit Felony — Minors — Double Jeopardy.

   The statute that makes it a felony for a person seventeen years of age or older to recruit, induce, solicit, or coerce a minor less than seventeen years of age to commit or to attempt to commit an act that would be a felony if committed by an adult indicates a clear intent by the Legislature to permit separate convictions and punishments for each separate felony for which a minor is recruited, induced, solicited, or coerced to commit or to attempt to commit, even if the adult had in mind only a single plan encompassing more than one felony (MCL 750.157c).

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *Gary L. Walker*, Prosecuting Attorney, and *Terrence Dean*, Appellate Counsel, for the people.

State Appellate Defender (by *P. E. Bennett*), for the defendant on appeal.

Before: SAWYER, P.J., and SMOLENSKI and WHITBECK, JJ.

PER CURIAM. Defendant, Mark Pfaffle, appeals as of right his bench trial conviction of two counts of inducing a minor to commit a felony[1] and fourth-degree criminal sexual conduct (CSC IV).[2] The trial court sentenced him to concurrent sentences of life in prison for the two inducement offenses and one year in prison for CSC IV. We affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

Pfaffle is a mentally disturbed, self-described Satanist who allegedly attempted to convince a fifteen-year-old boy (hereinafter John Doe)[3] to help him find young children to rape and kill by giving him alcohol and cigarettes and, on at least one occasion, lending him money. Pfaffle may have chosen Doe to help him carry out his plan because, as he wrote in several notes detailing his plan, he loved Doe and viewed him as a "spouse."

According to Doe, Pfaffle assembled a kit to carry out his plan to rape and kill children; the kit included

---

[1] MCL 750.157c.

[2] MCL 750.520e.

[3] We have changed the names of the children involved in this case to protect their privacy.

duct tape, knives, condoms, rubber gloves, and a rubber ball. In a handwritten note, Pfaffle precisely described the types of victims he wanted: males ages seven to ten, ten to twelve, and thirteen to fifteen years old. Doe claimed that he and Pfaffle discussed the plan ten to fifteen times and set up a camp in the woods near a medical center from which to carry out the attacks. On one occasion, Pfaffle hid in the woods by a trail, where he prepared duct tape strips to use to restrain and gag the children that Doe was to lure into the woods according to their plan. However, Doe said that he never actually attempted to lure any children to the tent, nor did he intend to do so. Rather, he lied to Pfaffle, telling him that no children came down the path on the day they hid in the woods. Doe said that he did not admit to Pfaffle that he had no intention of helping him carry out his plan because he wanted Pfaffle to continue to give him alcohol and cigarettes.

On July 7, 1997, Pfaffle allegedly tried to abduct a four-year-old boy (hereinafter John Smith) from his front yard. According to Smith's mother, Smith said that Pfaffle told him he had nice toys and wanted the boy to go with him for a walk in the woods. When Smith's mother saw the boy talking to Pfaffle, she came out of the house and asked Pfaffle what he wanted, but he did not respond before walking away from her.

Christopher Ollie and Fred Black, area residents, saw what they perceived to be a suspicious tent in the woods three hundred yards behind the Smith's house on July 8, 1997. Ollie found that the tent was well camouflaged and asked Black to approach the tent with him. When the two men arrived at the tent,

no one was there. Ollie opened the tent and saw a legal pad that contained a description of a plot to rape and murder children. The two men then summoned the authorities.

Undersheriff James Bjorne testified that the police arrived at the scene and, after securing the area, entered the tent to see if there were any victims in it. There was no one in the tent. The officer, seeing the note on the legal pad, took a photograph of it. The police then obtained a search warrant and seized the contents of the tent, which included knives, lingerie, photographs of young boys, the legal pad, and astrology books. Ultimately, the police arrested Pfaffle and charged him with two counts of inducing a minor to commit a felony for his efforts to entice Doe to help him commit CSC I and murder. The separate CSC IV charge stemmed from an incident in 1997 in which Pfaffle fondled Doe's genitals during a "teaching session." Pfaffle, who was found competent to stand trial although suffering from a "schizotypal" personality, waived his right to a jury trial. Following Paffle's conviction and sentencing. the trial court denied his motion for a new trial and disqualification of the prosecutor for conflict of interest.

## II. PROSECUTORIAL CONFLICT OF INTEREST

### A. STANDARD OF REVIEW

Pfaffle first argues that he is entitled to a new trial because the prosecutor who worked on this case had a personal connection to the case. Pfaffle claims that he suffered prejudice from the prosecutor's bias stemming from that relationship because the prosecutor took a hard-line approach to prosecution, refused to

negotiate a plea agreement Pfaffle found acceptable, and sought the most severe sentence available. Essentially, this is a prosecutorial misconduct claim. We generally review de novo allegations of prosecutorial misconduct.[4] To the extent that we must review the trial court's factual determination that there was no reason to disqualify the prosecutor, our review would be for clear error.[5] However, because Pfaffle failed to preserve this issue at trial,[6] our review is actually for plain error that affected his substantial rights.[7]

### B. THE PROSECUTOR'S COMMENTS

Pfaffle states that he first became aware of the prosecutor's conflict of interest at sentencing when the prosecutor argued that the trial court should impose a life sentence without the possibility of parole or a life sentence with the possibility of parole. The prosecutor, responding to defense counsel's argument that Pfaffle had not actually murdered or raped a child, pointed out that Pfaffle had done more than merely think "evil" thoughts, he had made significant preparations and attempts to commit the crimes:

> So this was not just an evil wish. This was an evil wish that came within a hair's breath [sic] of completion.

---

[4] See *People v Noble*, 238 Mich App 647, 660; 608 NW2d 123 (1999) (requiring direct examination of the record and individualized evaluation).

[5] See *People v Doyle*, 159 Mich App 632, 641; 406 NW2d 893 (1987) (*Doyle I*), mod on other grounds (*On Rehearing*), 161 Mich App 743; 411 NW2d 730 (1987) (*Doyle II*), ("[T]he determination of the existence of a conflict of interest is a question of fact and should be reviewed under the clearly erroneous standard of MCR 2.613[C].").

[6] See *In re Osborne*, 459 Mich 360, 368-369; 589 NW2d 763 (1999); *People v Harris*, 144 Mich 12, 13-14; 105 NW 715 (1906).

[7] See *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).

When [Smith] was brought in for the lineup and he pointed out the defendant as being the person who had talked to him in his yard, after the lineup was completed, I walked in to talk to [Smith] and his mother and [Smith] looked at me and he said, "you're ["Jimmy's"[8]] dad, aren't you?" *I have a little boy who's exactly the same age as [Smith] and, in fact is one of [Smith's] best friends.*

What this brought home to me, your Honor, is the impact on the community had the defendant carried out this crime would have been enormous. It would have changed how we view ourselves. It would change how we act in our everyday lives. And, therefore, the crime that was planned here was an enormously evil crime.[9]

According to the testimony at the postsentencing hearing concerning the motion to disqualify the prosecutor's office,[10] Pfaffle's trial counsel, Theodore Fulsher, knew about this connection between Smith and the prosecutor's son from an early point in the case, but Pfaffle did not personally know of the connection before sentencing. Fulsher said that he believed that the prosecutor had strong feelings about this case, that the prosecutor "was not going to give Mr. Pfaffle any quarter at all," and that the prosecutor took the case personally. Nevertheless, Fulsher said that he had not moved to disqualify the prosecutor because he thought that the fact that the prosecutor's son and Smith were in the same preschool class was insufficient evidence of a conflict of interest. The prosecutor also testified, explaining that even though Smith recognized him, the day he saw Smith at the

---

[8] Referring to the prosecutor's son.

[9] Emphasis added.

[10] See MCL 49.160(1) (prosecutor's office may be disqualified and a special prosecutor appointed if there is a "conflict of interest or [the prosecutor] is otherwise unable to attend to the duties of the office").

lineup was the first time they had ever met each other. The prosecutor said that Smith had never been to his house, he had never been to Smith's house except in connection with this case, he and the Smith family were merely "acquaintances," and his son was no longer friends with Smith because they attended different schools. Though the prosecutor said that he felt strongly about the case, he said that he made calculated decisions regarding his tough approach to his case, including the thirty-year-minimum sentence he offered in return for a guilty plea, because he thought Pfaffle was a danger to the community and could not be reformed.

The trial court, in a written opinion and order denying the motion to disqualify the prosecutor, commented regarding the small number of times that the prosecutor and the Smith family came into contact, noting:

> Such a connection in a small community like Marquette is commonplace. If prosecutors were to disqualify themselves every time they had such a casual connection with a witness or a victim, it would indeed create severe problems in judicial efficiency in the criminal law area. . . . As the judge who presided over the trial in this case, I had numerous opportunities to view [the prosecutor's] conduct of the case. I saw no indication during the trial and post-trial proceedings of [his] personal involvement. What I did see was a prosecutor who took a hard stance on this prosecution. He argued for a life sentence, without parole, which this Court declined to give. [The p]rosecutor . . . gave valid reasons for his tough prosecution of the defendant. It was his opinion that the defendant was a pedophile [and] not susceptible to rehabilitation and would constitute a menace to children as long as he was not imprisoned. The prosecutor decided that he would settle for nothing less than a 30-year

minimum prison term, which was not acceptable to the defendant.

\*     \*     \*

Mr. Fulsher also testified that he thought [the prosecutor] took the case personally and saw his son as a potential victim, and yet Mr. Fulsher did not see this as a conflict of interest or make any objection or even tell his client about it, although he knew about the connection with the [Smiths] well before the trial. I do not find from this record that [the prosecutor] became personally involved in the case to the extent that he lost his objectivity. The fact of the matter is the crimes that the defendant were [sic] convicted of were horrible and the potential would have been devastating to the community. This Court feels that had the defendant not been interrupted by arrest, he would probably have abducted and murdered a child.

I therefore find [a] substantial basis for the prosecutor's zeal in prosecution, and I do not find a conflict of interest arising from the relationship between the two 4-year-olds or an appearance of impropriety.

The law is clear that a prosecutor's fundamental obligation is "to seek justice, not merely to convict."[11] In allowing courts to appoint special prosecutors when there is evidence that the prosecutor originally charged with pursuing the case has interests that are in conflict with a case,[12] the Legislature has acknowledged that a conflict of interest can cloud a prosecutor's otherwise keen judgment. Any resultant prosecutorial misconduct that denied the defendant a

---

[11] *People v O'Quinn*, 185 Mich App 40, 43; 460 NW2d 264 (1990); see also *People v Auerbach*, 176 Mich 23, 44; 141 NW 869 (1913) ("[T]he prosecuting attorney . . . must be exclusively a representative of public justice, and stand indifferent as between the accused party and any private interest."); Comment following MRPC 3.8 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.").

[12] MCL 49.160(1).

fair trial[13] and led to a conviction would surely entitle the defendant to a new trial.[14] The cases dealing with prosecutorial conflict of interest bear out this conclusion.[15]

However, the record in this case plainly indicates that the prosecutor's contact with the Smith family was minor. The prosecutor did not know Smith personally, the prosecutor and the Smiths were not blood relatives, the prosecutor's own son was not an intended victim, and the prosecutor had no stake in the outcome of this case, whether financial or personal, other than to protect the community, which was his job. There is no evidence of an actual conflict of interest.

Nor did any connection between the prosecutor and the Smith family, though less than a conflict of interest, prejudice Pfaffle by affecting the plea bar-

---

[13] Note that *Osborne*, *supra* at 368-369, hints that evidence of a prosecutor's conflict of interest does not lead to automatic reversal. There must be some sort of prejudice meriting relief.

[14] *People v Paquette*, 214 Mich App 336, 342; 543 NW2d 342 (1995) ("The test [for prosecutorial misconduct] is whether defendant was denied a fair and impartial trial."); *People v Foster*, 175 Mich App 311, 319; 437 NW2d 395 (1989), disapproved on other grounds *People v Fields*, 450 Mich 94, 115; 538 NW2d 356 (1995) (new trial as remedy for prosecutorial misconduct).

[15] See, e.g., *People v Fitzsimmons*, 183 Mich 284, 289; 149 NW 976 (1914) (new trial granted because prosecutor had financial interest in outcome of prosecution for embezzlement because his money was on deposit at the bank at issue); *People v Hillhouse*, 80 Mich 580, 582-584; 45 NW 484 (1890) (prosecutor disqualified for representing the complaining witness in a civil suit against defendant); *People v Cline*, 44 Mich 290, 296; 6 NW 671 (1880) (defendant entitled to new trial because prosecutor was disqualified because his brother was the complaining witness and there was a financial entanglement); *Doyle I*, *supra* at 636-638, and *Doyle II*, *supra* at 745 (personal relationship between defendant and chief assistant prosecutor, who were brothers-in-law, merited disqualification of entire county prosecutor's office).

gain process.[16] Contrary to Pfaffle's suggestion, the prosecutor did engage in plea negotiations with him. The parties simply did not agree to the minimum prison term Pfaffle should serve. Though we certainly see the attractiveness of a five-year term, which was evidently the time Pfaffle was willing to serve, we agree with the trial court that, given the seriousness of the charges, the prosecutor properly acted within his discretion by refusing to offer a lower sentence in exchange for a guilty plea and by seeking a long sentence following conviction. Though there can be no doubt that the prosecutor acted zealously in this case, there is no reason to believe that he did so for illegitimate reasons. To paraphrase the Michigan Supreme Court in *People v O'Neill*,[17] Pfaffle did not have a right to have an attorney who was indifferent to his offenses prosecute the case against him.

As for Pfaffle's contention that the prosecutor's alleged conflict of interest caused him prejudice in sentencing, this argument is equally without merit. In requesting that the trial court impose a harsh sentence, the prosecutor expressed his concern that Pfaffle could not be reformed and that the community was at risk from his behavior. From the context of his argument as a whole, it appears that the similarities between his son and Smith merely prompted the prosecutor to think about these overarching factors,

---

[16] See, generally, *People v Mayhew*, 236 Mich App 112, 128; 600 NW2d 370 (1999) (prosecutor who had conflict of interest did not affect prosecution in any way, and, therefore, the defendant suffered no prejudice that would require a new trial).

[17] *People v O'Neill*, 107 Mich 556, 559-560; 65 NW 540 (1895).

which was proper.[18] The prosecutor did not ask the trial court to impose a harsh sentence *because* he had a child Smith's age or *because* he knew of the Smith family. Further, the trial court was not overly swayed by the prosecutor's approach to this case. For instance, the trial court rejected the prosecutor's request for a sentence of life without the possibility of parole. Thus, we conclude that Pfaffle has not demonstrated plain error affecting his substantial rights with regard to the question of the prosecutor's alleged conflict of interest. Because there is no basis to conclude that the prosecutor had a conflict of interest, there is no need to address Pfaffle's argument that the entire Marquette County Prosecutor's Office should have been disqualified in this case on the basis of the prosecutor's alleged conflict of interest.

### III. THE INDUCEMENT STATUTE

#### A. STANDARD OF REVIEW

Pfaffle argues that the statute prohibiting inducing a minor to commit a felony, MCL 750.157c (the inducement statute), should be construed so that it only prohibits inducements that result in an attempt by a minor to commit the proposed felony or in the minor actually committing the felony. Under that interpretation, he contends, he is not guilty of the two inducement offenses for which he was convicted because Doe never completed either a rape or a mur-

---

[18] See *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972) ("reformation of the offender" and "the protection of society" are proper sentencing considerations).

der and never intended or attempted to do so. Appellate courts interpret statutes de novo.[19]

The crux of Pfaffle's argument is that if this Court does not require proof that the minor completed the felony or attempted to commit the felony when interpreting and applying the inducement statute,[20] then the inducement statute will simply duplicate MCL 750.157(b) (the solicitation statute). From his perspective, the Legislature did not intend to allow two statutes to punish what is essentially the same offense: asking another person to commit a felony. To support this theory, Pfaffle traces the legislative history of the solicitation statute and judicial interpretations leading up to the Legislature's enactment of the inducement statute. He, therefore, gives significant attention to the language in the solicitation statute and somewhat less attention to the inducement statute, which is the statute he was convicted of violating.

Contrary to Pfaffle's approach, we must first focus on the inducement statute itself, so that we can give effect to its unambiguous language.[21] " 'When a legislature has unambiguously conveyed its intent in a statute, . . . the proper role of a court is simply to *apply* the terms of the statute to the circumstances in a particular case.' "[22] In interpreting and applying the

---

[19] *People v Webb*, 458 Mich 265, 274; 580 NW2d 884 (1998).

[20] MCL 750.157c.

[21] *People v Oliver*, 242 Mich App 92, 95; 617 NW2d 721 (2000).

[22] *People v McIntire*, 461 Mich 147, 153; 599 NW2d 102 (1999), quoting and adopting *People v McIntire*, 232 Mich App 71, 119; 591 NW2d 231 (1998) (YOUNG, J., dissenting) (emphasis in original).

statute, we give the words their plain and commonly understood meaning,[23] consulting a dictionary if necessary.[24] We take care not to render any portions of the statute meaningless[25] because we cannot assume "that the Legislature intended to do a useless thing."[26] In that regard, our rules of statutory construction allow us to read two related statutes in pari materia, meaning that they are read as if they are a single statute in order to harmonize their provisions if at all possible.[27] Only if we use these interpretive devices to give meaning to the inducement statute and conclude that it is susceptible of more than one meaning, that is, that it is ambiguous,[28] are we at liberty to discern the Legislature's intent through other means.[29]

### C. INTERPRETING THE INDUCEMENT STATUTE

The inducement statute provides:

A person 17 years of age or older who *recruits, induces, solicits, or coerces* a minor less than 17 years of age *to commit or attempt to commit* an act that would be a felony if committed by an adult is guilty of a felony and shall be punished by imprisonment for not more than the maximum term of imprisonment authorized by law for that act. The

---

[23] *People v Morey*, 461 Mich 325, 330; 603 NW2d 250 (1999); see also MCL 750.2 ("The rule that a penal statute is to be strictly construed shall not apply to this act or any of the provisions thereof. All provisions of this act shall be construed according to the fair import of their terms, to promote justice and to effect the objects of the law.").

[24] *People v Gould*, 225 Mich App 79, 84; 570 NW2d 140 (1997).

[25] *People v Stephan*, 241 Mich App 482, 497; 616 NW2d 188 (2000).

[26] *People v Weiss*, 191 Mich App 553, 559; 479 NW2d 30 (1991).

[27] *People v Ellis*, 224 Mich App 752, 756; 569 NW2d 917 (1997).

[28] *People v Stone Transport, Inc*, 241 Mich App 49, 51; 613 NW2d 737 (2000).

[29] *People v Borchard-Ruhland*, 460 Mich 278, 284-285; 597 NW2d 1 (1999).

person may also be punished by a fine of not more than 3
times the amount of the fine authorized by law for that
act.[30]

Only the first sentence of this statute, which defines
the conduct it prohibits, is at issue in this case. The
key words in this first sentence are "recruits, induces,
solicits, or coerces" and "to commit or attempt to
commit an act that would be a felony if committed by
an adult."

By drafting the statute in the disjunctive,[31] the Leg-
islature indicated that these four actions—recruit-
ment, inducement, solicitation, or coercion—can be
considered separately.[32] In other words, an adult need
only recruit, or induce, or solicit, or coerce a minor to
commit or attempt to commit a felony to violate this
statute. Thus, there is no reason to conclude from the
face of the statute that these terms are interchange-
able, in effect synonyms for the same prohibited con-
duct. Rather, the plain language of the statute prohib-
its adults, people over the age of seventeen, from
engaging in eight different acts with respect to
minors, people under age seventeen. First, an adult
may not *recruit* a minor to *commit* an act that would
be a felony if committed by an adult. Second, an adult
may not *recruit* a minor to *attempt* to commit an act
that would be a felony if committed by an adult.
Third, an adult may not *induce* a minor to *commit* an
act that would be a felony if committed by an adult.
Fourth, an adult may not *induce* a minor to *attempt*

---

[30] Emphasis supplied.

[31] See *Caldwell v Chapman*, 240 Mich App 124, 131; 610 NW2d 264
(2000).

[32] See *Century Surety Co v Charron*, 230 Mich App 79, 83; 583 NW2d
486 (1998).

to commit an act that would be a felony if committed by an adult. Fifth, an adult may not *solicit* a minor to *commit* an act that would be a felony if committed by an adult. Sixth, an adult may not *solicit* a minor to *attempt* to commit an act that would be a felony if committed by an adult. Seventh, an adult may not *coerce* a minor to *commit* an act that would be a felony if committed by an adult. Eighth, an adult may not *coerce* a minor to *attempt* to commit an act that would be a felony if committed by an adult.

The question that must be answered in interpreting this statute is what the Legislature meant when it used the words "recruits, induces, solicits, or coerces." The meanings of these words are fairly self-evident. To the extent that a more technical definition might be helpful, the dictionary[33] defines the verb "recruit" in relevant part as "to engage in finding and attracting new members." "Induce" means "to lead or move by persuasion or influence, as to some action or state of mind."[34] In contrast, "solicit" does not require any commitment or action by the minor being solicited, rather it merely requires the adult "to try to obtain by earnest plea or application" or "to entreat; petition."[35] In more simple terms, to solicit means to ask.[36] "Coerce" means "to compel by force or intimi-

---

[33] *Random House Webster's College Dictionary* (2d ed), p 1088.

[34] *Id.* at 666.

[35] *Id.* at 1228.

[36] The Legislature gave the word "solicit" a special meaning in the solicitation statute, MCL 750.157b(1), defining it as "to offer to give, promise to give, or give any money, services, or anything of value, or to forgive or promise to forgive a debt or obligation." However, the Legislature specified that that definition applied only for the "purposes of this section," meaning the solicitation statute. *Id.* Therefore, there is no reason to believe that definition in the solicitation statute, rather than the common

dation" or "to bring about through force."[37] In some respects, coercion is another facet of inducement. Both actions by an adult seek to have the minor do something. These actions differ in that coercion relies on force or intimidation in some form, implying that the minor may have no reasonable choice whether to carry out the act the adult seeks to have committed or attempted. In contrast, an adult who induces a minor may rely on a more indirect approach to persuading the minor to commit or attempt to commit the felony, such as offering gifts, payment, or even convincing the minor that committing or attempting to commit the felony is the right thing to do.

Out of these four different actions, only two require the minor to commit a felony or attempt to commit a felony: inducement and coercion. Especially telling with respect to inducement is that "induce" means "to bring about or cause."[38] An adult who induces a minor to commit or attempt to commit a felony has essentially persuaded that minor "to bring about or cause" the felony. Coercion has an almost identical meaning in that an adult who coerces a minor to commit or attempt to commit a felony has used "force or intimidation" to "bring about" that crime.[39]

Recruitment and solicitation do not, however, naturally require the minor to commit or attempt to commit the felony. Instead, the definitions of these words emphasize the adult's conduct in attracting a minor or asking a minor to commit or attempt to commit the

---

meaning of the word "solicits," should apply in the context of the inducement statute.

[37] *Random House Dictionary, supra* at 254.

[38] *Id.* at 666.

[39] *Id.* at 254.

felony. In other words, the felony is *why* the adult is recruiting the minor or *what* the adult is soliciting the minor to do. For example, an adult gang member may approach a minor to ask the minor to join the gang as a runner, a person who delivers drugs. The adult's efforts in seeking to have the minor become part of the gang organization so that the minor can commit the felony of drug delivery[40] constitutes recruiting. An adult who asks a minor to deliver drugs without asking the minor to join an organization involved in the drug business has not recruited the minor. Rather, that adult has solicited the minor by asking the minor to commit or attempt to commit the felony drug delivery.[41]

By using these alternate terms to describe the prohibited conduct, the language of the statute suggests that the Legislature enacted the inducement statute to prohibit adults from taking advantage of minors to further the adults' own felonious activities.[42] Our interpretation of the statute, which permits conviction of an adult for recruiting or soliciting a minor even if the minor does not actually commit or attempt to commit the felony, is consistent with this comprehensive statutory scheme. That an adult may also be convicted if the minor does commit or attempts to commit the felony under the language of the inducement statute only further illustrates the Legislature's intent to prohibit a broad spectrum of behavior by adults.

---

[40] See MCL 333.7401(1).

[41] *Id.*

[42] See, generally, *People v Nickerson*, 227 Mich App 434, 440; 575 NW2d 804 (1998) (by using the disjunctive in the statute prohibiting operation of a vehicle while under the influence of intoxicating liquor, the Legislature broadened the prohibited conduct).

Though the facts of this case indicate that Doe never actually murdered a child, or attempted to do so, the evidence is clear that Pfaffle attempted to persuade Doe to join his plans to rape and to murder children by offering him alcohol and cigarettes. This constituted recruitment under the inducement statute. Pfaffle also solicited Doe to help with two different plans, according to one of the notes found in the tent. Read reasonably, the first request was for Doe to rape someone near the medical center and the second request was for him to bring someone to the tent to rape and to kill. Further, on one occasion Pfaffle sent Doe to find a child to rape and murder while he, Pfaffle, waited at the tent. Whether this was the combination rape and murder is unclear. Nevertheless, it underscores that Pfaffle asked Doe to commit more than one felony: the rape and the combination rape and murder. Even if Pfaffle's conduct did not constitute inducement or coercion, because Doe never acted, Pfaffle's acts of recruiting Doe and soliciting him to commit two, and possibly three, felonies[43] were punishable under the inducement statute.

### D. *REHKOPF*

Because we conclude that the inducement statute is neither unclear nor ambiguous, we see no need to delve into legislative history to determine its meaning. Committee reports and other forms of legislative history, such as staff analyses, are suspect for a number

---

[43] All forms of criminal sexual conduct constitute a felony except for CSC IV. See MCL 750.520b(2) (CSC I); MCL 750.520c(2) (CSC II); MCL 750.520d(2); (CSC III); MCL 750.520e(2) (CSC IV). Murder is also a felony. See MCL 750.316 (first-degree murder); MCL 750.317 (second-degree murder).

of reasons.[44] We do note, further, that the case on which Pfaffle relies in his legislative history argument, *People v Rehkopf*,[45] which interpreted an earlier version of the solicitation statute[46] to require the person solicited to attempt or actually commit a crime that the defendant incited, induced, or exhorted, does not change our interpretation of the inducement statute. The two statutes, and therefore the legal underpinnings of *Rehkopf* and this case, differ in several significant respects.

First, the Legislature used different terms to describe the prohibited conduct in the two statutes. The solicitation statute as it applied in *Rehkopf*, referred to a person who "incites, induces or exhorts" another person to commit an enumerated crime.[47] In contrast, the inducement statute refers to an adult who "recruits, induces, solicits, or coerces." Only one of these terms, "induces," appears in both statutes. Our interpretation of the word "induces" in the inducement statute, while faithful to the common understanding of the term, is also consistent with the meaning ascribed to that term in *Rehkopf*.[48]

The second major distinction between this case and *Rehkopf* is the nature of the statute at issue. The *Rehkopf* Court found the solicitation statute to be ambiguous,[49] which then allowed the Court to apply the

---

[44] See *In re Complaint of Michigan Cable Telecommunications Ass'n*, 241 Mich App 344, 372-373; 615 NW2d 255 (2000).

[45] *People v Rehkopf*, 422 Mich 198, 205; 370 NW2d 296 (1985).

[46] MCL 750.157b.

[47] *Rehkopf, supra* at 203, n 1.

[48] *Id.* at 206.

[49] *Id.*

rule of lenity[50] to interpret the solicitation statute in a manner that lessened its harsh effect on individuals whose efforts to incite, induce, or exhort others to commit an enumerated felony ultimately failed. In contrast, we think the inducement statute is clear. Therefore, unlike in *Rehkopf*, we lack the prerequisite for applying the rule of lenity to find a legally cognizable interpretation of the inducement statute.[51]

Third, the solicitation statute, as amended[52] by 1996 PA 124, no longer includes the "incites, induces or exhorts" language whatsoever and now represents, in fact, an almost completely different approach to punishing solicitation offenses. Unlike the solicitation statute interpreted in *Rehkopf*, solicitation no longer requires proof that the individual the defendant solicited committed or attempted to commit the felony.[53] It would defy logic to think that we should be bound by an interpretation of a statute other than the one at issue in this case, especially when that other statute no longer exists in even a roughly similar form. Though we respect and honor the rule of stare deci-

---

[50] See *People v Denio*, 454 Mich 691, 699; 564 NW2d 13 (1997) ("The 'rule of lenity' provides that courts should mitigate punishment when the punishment in a criminal statute is unclear."); see also *People v Bergevin*, 406 Mich 307, 312; 279 NW2d 528 (1979), quoting *Bell v United States*, 349 US 81, 83; 75 S Ct 620; 99 L Ed 905 (1955) (An ambiguous statute " 'should be resolved in favor of lenity. And this not out of any sentimental consideration, or for want of sympathy with the purpose of Congress in proscribing evil or antisocial conduct. It may fairly be said to be a presupposition of our law to resolve doubts in the enforcement of a penal code against the imposition of a harsher punishment.' ").

[51] *Rehkopf, supra* at 207, 214.

[52] Though Pfaffle uses the amendment of the solicitation statute as an invitation to look into the legislative history of the inducement statute, we have already explained there is no need to do so in this case. See *In re Complaint of Michigan Cable Telecommunications Ass'n, supra*.

[53] See *People v Crawford*, 232 Mich App 608, 616; 591 NW2d 669 (1998) ("Solicitation is complete when the solicitation is made.").

sis,[54] the analysis in *Rehkopf* would only bind our decision in this case if it resolved issues that were the same as the issues in this case.[55] Because the differences between this case and *Rehkopf* are plain and substantial, our decision does not contemplate doing the impossible, which would be to overrule *Rehkopf* or disregard it when it was binding precedent.

Fourth, the inducement statute addresses special circumstances not at issue in the old solicitation statute, namely, that an adult who violates the inducement statute is not entering into or attempting to enter into what is essentially a criminal contract with an adult who can exercise independent judgment. Rather, under the inducement statute, the adult must take advantage of the minor, or attempt to do so, through recruitment, solicitation, inducement, or coercion. In other words, the inducement statute not only protects society in general against adults who attempt to use others to commit felonies, as does the solicitation statute, it *also* specifically protects children from adults who would use them as if they were pawns. Consequently, we do not have the same concern that the *Rehkopf* Court had when it questioned the justness of punishing the person who solicited a crime more severely than the person who acted on the solicitation.[56] In the context of the inducement statute, the adult's moral culpability in taking advantage of a minor, who may not fully understand what

---

[54] See *Edwards v Clinton Valley Center*, 138 Mich App 312, 313; 360 NW2d 606 (1984).

[55] See *Kent Co Deputy Sheriffs' Ass'n v Kent Co Sheriff*, 238 Mich App 310, 326; 605 NW2d 363 (1999), aff'd on other grounds 463 Mich 353 (2000).

[56] *Rehkopf, supra* at 212-214.

the adult seeks, who may not have the ability to with-
stand pressure from the adult, and who might be put
at risk of harm because of the adult's actions, justifies
the harsh penalty against the adult.

Finally, we find no support in *Rehkopf* for Pfaffle's
proposition that we must read the inducement statute
as requiring a completed or attempted felony *because*
the solicitation statute does *not* require a completed
or attempted felony. Even if these two statutes were
substantively identical, *Rehkopf* does not require a
rule of statutory interpretation that would give a
unique meaning contrary to one statute's interpreta-
tion solely to avoid duplicating the interpretation of
another statute. Nor has Pfaffle provided authority
that outlines this sort of interpretive rule. Even if
there were such a rule, there are substantial differ-
ences in the aims and language of these two statutes,
which work against reading them in pari materia in
order to achieve the interpretation Pfaffle urges.[57] In
sum, we are not convinced that we should depart
from applying the plain language of the inducement
statute because of any minor similarities between it
and the solicitation statute or on the basis of *Rehkopf*.

### IV. DOUBLE JEOPARDY

#### A. STANDARD OF REVIEW

Pfaffle argues that convictions of both inducing a
minor to commit murder and inducing a minor to
commit criminal sexual conduct violated his right to

---

[57] See *People v Pitts*, 216 Mich App 229, 233; 548 NW2d 688 (1996)
(Statutes should be read in pari materia only if "they relate to the same
person or thing, to the same class of persons or things, or have the same
purpose or object.").

be free from double jeopardy[58] because both convictions stemmed from a single "scheme." He did not raise this issue at trial. Therefore, we review this alleged double jeopardy violations for plain error affecting his substantial rights.[59]

### B. DIFFERENT ACTS

"The United States and the Michigan Constitutions protect a person from being twice placed in jeopardy for the 'same offense.' "[60] "The intent of the Legislature is the determining factor under the Double Jeopardy Clause of the United States and Michigan Constitutions,"[61] because double jeopardy protects defendants, in part, by keeping courts from exceeding the punishment prescribed by the Legislature.[62] In drafting the text of the inducement statute, the Legislature made clear that it was punishing the adult's act of recruiting, inducing, soliciting, or coercing a minor to commit or attempt to commit a felony. In our analysis, above, we concluded that each of these acts should be considered separately in order to give full effect to the language the Legislature used in crafting a statute intended to prohibit a large array of behavior. Further, the language of the inducement statute, which refers in the singular to "an act" and "a felony" suggests that the criminal act intended and the recruitment, inducement, solicitation, or coercion

---

[58] US Const, Am V; Const 1963, art 1, § 5.

[59] *People v Wilson*, 242 Mich App 350, 360; 619 NW2d 413 (2000).

[60] *People v Torres*, 452 Mich 43, 63; 549 NW2d 540 (1996).

[61] *Denio, supra* at 706, citing *People v Robideau*, 419 Mich 458, 485; 355 NW2d 592 (1984).

[62] See, generally, *People v Walker*, 234 Mich App 299, 304-307; 593 NW2d 673 (1999).

should be considered as a single unit. This Court came to a similar conclusion in *People v Vandelinder*,[63] in which it concluded that three convictions of solicitation stemming from the same conversation were proper because the defendant asked the person he solicited to commit three separate crimes. Critical to this Court's holding in *Vandelinder* was its determination that "[t]he Legislature intended to punish solicitation according to the nature of the crime solicited,"[64] which is similar to our conclusion that the adult's recruiting, inducing, soliciting, or coercive behavior in conjunction with the criminal act intended constitute the proper unit for prosecution.

In this case, aside from the recruitment as a whole, Pfaffle solicited Doe to commit rape near the medical center and solicited him to commit a murder that included a rape in the tent. Had Pfaffle been convicted of conspiracy rather than inducement we would focus on the nature of his plan rather than his individual acts.[65] However, he was charged with and convicted of a crime under a statute that obliges us to look at his actions as they fit into the categories of recruitment, inducement, solicitation, and coercion. Pfaffle's two separate convictions under the induce-

---

[63] *People v Vandelinder*, 192 Mich App 447, 451-453; 481 NW2d 787 (1992); *People v Mackle*, 241 Mich App 583, 587-588, 594; 617 NW2d 339 (2000) (though it was improper for the jury to convict defendant of twelve acts of CSC conduct when the prosecutor alleged only six acts, each supported by alternative theories, it was proper to convict him of multiple acts of CSC for each penetration that occurred during the lengthy criminal episode).

[64] *Vanderlinder, supra* at 453.

[65] See *People v Braylock*, 118 Mich App 54, 57; 324 NW2d 530 (1982) (although conspiracy may involve breaking multiple laws, the agreement is the unit for the purposes of prosecution; a single agreement is a single conspiracy).

ment statute did not violate double jeopardy because they are consistent with the Legislature's intent to punish an adult for *each* act of recruitment, inducement, solicitation, or coercion of a minor to commit or attempt to commit a felony even if, as Pfaffle contends, that adult had only a single plan to harm children.[66]

V. SENTENCING

A. STANDARD OF REVIEW

Pfaffle argues that his sentence was disproportionate. We review a sentence imposed for a crime that was committed before the legislative sentencing guidelines went into effect to determine if the trial court abused its sentencing discretion.[67]

B. PROPORTIONALITY

A sentence must be "proportionate to the seriousness of the circumstances surrounding the offense and the offender."[68] The trial court in this case gave

---

[66] We specifically note that this case does not require us to consider whether there can be more than one act of recruiting, and therefore more than one conviction, when there is an ongoing relationship between the adult and the minor, as there apparently was between Pfaffle and Doe. In other words, we are not asked to determine whether multiple attempts to recruit a minor to commit or attempt to commit a felony can be considered separately for double jeopardy purposes. Similarly, the facts of this case do not require us to consider whether an adult's single solicitation of a minor to commit or attempt to commit more than one felony can result in multiple convictions without violating the constitution. Nor must we determine if multiple requests to commit the same specific felony can be considered multiple solicitations. Thus, this opinion should not be read as announcing an interpretation that will resolve all double jeopardy challenges under the inducement statute.

[67] See *People v McCrady*, 213 Mich App 474, 483; 540 NW2d 718 (1995).

[68] *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990).

ample reasons for imposing two life sentences in this case, commenting:

> First, I believe that Mr. Pfaffle, the defendant, would have kidnapped, abused, and killed a child if he had not been arrested. I believe that.
>
> Second, I believe that Mr. Pfaffle has corrupted this 15-year-old victim. I reviewed a letter I received from his parents yesterday and we all just heard what his parents had to say [regarding the negative effect he had on Doe's life]. And there is no doubt in my mind that the defendant has gravely damaged this young man, probably for life. He was 15 years old at the time and he was younger than that when the defendant caught him up in his web. And I find that his future is clouded by what Mr. Pfaffle did to him.
>
> Third, I have considered the fact that the defendant tried to abduct four-year-old [Smith] from his backyard in Marquette Township in July of '97. And I can only imagine the nightmares that have—that this has caused [Smith's] parents.
>
> Fourth, I have read the psychiatric reports, the mental health information, the volume of information that has come to the Court, and I have considered the fact that the defendant was convicted in 1996 of accosting a child for immoral purposes and has a prior felony on his record.
>
> I've also considered the fact that although the defendant was criminally responsible for his actions, he is mentally ill in a way that makes him a particular menace to the community. He has been diagnosed as a pedophile. If he were released back to the community, he would present a real danger to children. This may change as he gets older and, hopefully, as he gets mental health treatment that he so obviously needs. And I am comfortable with the thought that some day the decision as to whether he is to be paroled will be in the hands of a parole board and they will make the right decision for the community and for Mr. Pfaffle.

We agree with the trial court's estimation of the danger that Pfaffle poses to the community and the seri-

ousness of his offense. While Pfaffle attempts to minimize his offenses, we have no reason to give him credit for the fact that Mrs. Smith interrupted his plans to harm her young child. Further, while Pfaffle may be both mentally ill and have brain damage to some degree, the trial court took these factors into consideration when sentencing him. We see no abuse of discretion in the life sentences imposed in this case.

Affirmed.